UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
(Alexandria Division)

| | |
|---|---|
| GREGORY and CARLA DREW, | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| v. | ) C.A. # 1:20-cv-736 |
| | ) |
| C. T. IRBY | ) |
| Fauquier County Sheriff's Office | ) |
| 78 West Lee Street, #200 | ) |
| Fauquier, VA  20186 | ) |
| | ) |
| and | ) |
| | ) |
| Deputy Violator, a pseudonym | ) |
| Fauquier County Sheriff's Office | ) |
| 78 West Lee St., #200 | ) |
| Fauquier, VA 20186 | ) |
| | ) |
| Defendants. | ) |

COMPLAINT

Preliminary and Jurisdictional Statement

1.  Plaintiffs Gregory and Carla Drew, a married couple living in Warrenton, Virginia, bring this action against two deputy sheriffs for unreasonable seizure, unreasonable search, and excessive force in connection with their arrest for having had a argument over whether their daughter should have caught a softball during a softball game. This case arises under the Fourth and Fourteenth Amendments to the Constitution of the United States and 42 U.S.C. §1983.  This court has jurisdiction under 28 U.S.C. §1331.  The court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over Mr. and Mrs. Drew's claims for false arrest and malicious prosecution, as they arise out of the same facts as those giving rise to their federal claims.

<u>Parties</u>

2. Plaintiff Gregory Drew is a 45 year old civil engineer. He lives with his wife, Carla, and their two daughters in Warrenton, Virginia.

3. Plaintiff Carla Drew is a 40 year old assistant principal at Patriot High School in Nokesville, Virginia. She lives with her husband, Greg, and their two daughters in Warrenton, Virginia.

4. Defendant C.T. Irby is and at all relevant times was a deputy sheriff in Fauquier County, Virginia. He is sued in his individual capacity.

5. Defendant Deputy Violator is and was at all relevant times a deputy sheriff in Fauquier County, Virginia. His actual name is presently unknown. Once his identity is obtained, this complaint will be amended to name him properly. He is sued in his individual capacity.

<u>Claim for Relief</u>

6. Mr. and Ms. Drew are a happily married couple, having been married in 2002. They are a peaceable and friendly couple. They do, however, have a habit of arguing loudly.

7. In the early evening of Saturday, September 28, 2019, the Drews and their two daughters returned home after attending one of their daughter's all-day softball tournaments. In the course of unloading their truck of softball equipment and other belongings, they entered into an argument related to their daughter's performance on her team. Their differences gave rise to a quarrel with raised voices. The argument lasted no longer than was necessary to unload their truck, whereupon they quietly walked into their home to join their daughters.

8. A neighbor was apparently offended at the Drews' raised voices and saw fit to call for law enforcement assistance.

9. Defendant Irby, on routine patrol that evening, responded to a call from dispatch regarding a "domestic incident in progress/verbal."

10. On information and belief, when defendant Irby responded to this call he did not know the identity of the person who made it, had had no prior law enforcement dealings with that person, and had no objective basis to assess the reliability of the complainant or the accuracy of the complainant's statements. He also had never met the Drews, nor had he had any law enforcement dealings with them or been called to their home on a prior occasion.

11. Deputy Irby entered the neighborhood where the Drews lived and initially went to the wrong address, not seeing anything unusual or troublesome anywhere. Having been directed to the right address, he left his car parked where it was and walked to the Drews' residence.

12. When Deputy Irby arrived at the Drew home, all was quiet. No one was outside.

13. Deputy Irby went to the house entrance, through which he was able to see Mr. Drew sitting alone in the living room watching television. He rang the doorbell.

14. Both Mr. and Ms. Drew heard the bell and walked to the front door, Ms. Drew from upstairs where she had been. The two arrived at the front door at the same time. Each was dressed in shorts and a tee shirt.

15. When the Drews opened their door to greet Deputy Irby, their encounter began cordially. Mr. Drew was standing just outside his house; Ms. Drew, just inside. Both were fully visible to Dep. Irby. They initially spoke of the Drews' dog, who ran out into the front yard.

16. Standing on the front steps of the Drew home just a few feet from them, Deputy Irby could readily see that they were of calm and friendly demeanor and casually but neatly dressed. No suggestion of hostility or aggression toward anyone was present. Deputy Irby perceived nothing that might have suggested that either Drew had engaged in assaultive behavior toward the other.

17. As of the time the Drews first opened the door, Deputy Irby knew or should have known that – assuming the complainant had called in accurate information in good faith in the first place – the verbal quarrel reported by dispatch was concluded and all was now calm and well.

18. Not imagining, apparently, that these were the people against whom the complaint had been called in, Deputy Irby asked them if they had called 911. They confirmed that they had not.

19. When Deputy Irby then stated that one of their neighbors had called to complain of them, Ms. Drew asked which neighbor. She did so because the Drews had a strained relationship with a neighbor who had once called the police to complain of lawful fireworks the Drews and their daughters had set off in their driveway on the Fourth of July, and once when the Drew's harmless and friendly dog broke through their electric barrier and ran into the neighbor's yard. The neighbor was annoyed when the police concluded the Drews had done nothing wrong.

20. In response to Carla's question to identify the neighbor who had complained, Deputy Irby's demeanor sharply changed. He demanded in an angry tone whether Ms. Drew was "getting an attitude" with him.

21. In an effort to de-escalate the situation, Mr. Drew assured Dep. Irby that no one was "getting an attitude" but rather trying to explain about a problem neighbor.

22. Mr. Drew was unable to finish his explanation. Deputy Irby announced he had "had enough," grabbed Mr. Drew, turned him around and forcefully pushed him against the front of their house.

23. Mr. Drew put his hands up and, still facing the wall, asked Deputy Irby to "calm down." Deputy Irby thereupon took two steps back and unholstered and fired his Taser into Mr. Drew's back. Mr. Drew fell to the steps, convulsing in pain.

24. Using his shoulder microphone, Dep. Irby reported to dispatch that he had fired his Taser and requested backup. The time that passed from when Dep. Irby arrived on the Drews' front stoop – including his ringing their doorbell, waiting for the Drews to respond, talking with them about their dog and allowing it to run into the yard, and asking them about the neighbor's call – to the time he tased Mr. Drew was less than 75 seconds.

25. Carla Drew was horrified as she witnessed her husband being tased in the back, fall to the ground and writhe in agony. She screamed and instinctively moved farther back into her home and away from the front door, calling her neighbor on her cell phone for help.

26. In response to Ms. Drew's speaking on her cell phone, Dep. Irby pointed his Taser at her face, entered her home without consent and yelled at her to lie on the floor. He lacked a warrant, and no exigent circumstances were present other than those his misconduct had created. Frightened by this aggression, and feeling compelled to accede to Dep. Irby's authority, Ms. Drew complied.

27. At the time Dep. Irby pointed his Taser at Ms. Drew's face, entered her home and commanded her to lie on the floor, he lacked information that would permit a reasonable officer to conclude that she had committed any crime. A reasonable officer in his position would also have known that his warrantless entry into her home for the purpose of seizing her in this manner was unlawful as a matter of settled law.

28. Having, as he imagined, sufficiently secured Ms. Drew, Dep. Irby returned to the front steps where he handcuffed Mr. Drew. He left the Taser darts in Mr. Drew's back.

29. Other deputies, including at least one female deputy, arrived at the scene and one escorted Mr. Drew to his patrol car. He was placed inside without being searched, it being apparent from his tee-shirt and shorts that he posed no threat to anyone. The taser probes remained lodged in his back, causing him continuing significant and unnecessary pain.

30. After her husband was removed from the front steps, Ms. Drew ran into the yard, shouting to neighbors across the street to get her children and then complaining to the newly arrived deputies that her husband had been attacked by Deputy Irby.

31. In response, Dep. Irby told another officer present that Ms. Drew was to be arrested. She was then handcuffed and placed in the back of another patrol car. She was not searched before being placed in the car, it being apparent from her tee-shirt and shorts that she posed no threat to anyone.

32. The Drews' daughters, age 9 and 11, witnessed the abuse of their parents and their parents' inability to mitigate it, and the Drews were aware of this as the abuse was ongoing.

33. The Drews were transported to the Fauquier Adult Detention Center.

34.  Mr. Drew was not searched or told he had to be searched after arriving at the Adult Detention Center.  He was never searched in that facility.

35.  Defendant Violator, who was on duty at the detention center, approached Ms. Drew, not Mr. Drew, and told her she had to be searched for weapons.  This was ostensibly as an administrative matter, given her apparently imminent admission to the facility, not incident to her prior arrest.

36.  Ms. Drew, who was barefoot, wearing a tee shirt, gym shorts and a sport bra, asked for a female officer to perform whatever search might be needed.

37.  Defendant Violator said that a female deputy was not present, to which Ms. Drew replied that a female deputy had just been at her home and could search her when she returned.  In the meanwhile, she could remain in handcuffs, or handcuffed to a bar or bench.

38.  Saying that he would not wait, defendant Violator stood Ms. Drew up on her feet, stepped behind her, bent her over, and reached around to the front of her chest with his left hand.  With his palm facing Ms. Drew's body he felt her right breast and then under the center of her bra between her breasts.  Ms. Drew reacted by screaming, kicking her feet back and ducking down as best she could while still holding the bar in front of her.

39.  Ms. Drew's screaming caused defendant Violator to stop his gratuitous, sexually intrusive search, conducted by him for no legitimate reason but to gratify himself at Ms. Drew's expense, and on information and belief impermissible under departmental regulations.  He handcuffed Ms. Drew, now seated, to a bar with her arms spread apart on each side.

40. The events described in ¶¶35-38 are depicted in Exhibit A, a series of still shots from the detention center video taken of these events, all of which are incorporated into this complaint according to what they visually demonstrate.

41. Ms. Drew was held in her seated position, hands apart, until the female deputy arrived approximately ten minutes later. The female deputy attended to her search without incident, finding nothing.

42. Defendant Violator did not search Mr. Drew, notwithstanding that he was the one who had been tased for alleged obstruction of Dep. Irby.  On information and belief, he simply undertook to gratify himself by groping Ms. Drew under guise of having to search her.

43. A reasonable male officer in Defendant Violator's position would have understood that acting as he did amounted to an unreasonable intrusion upon Ms. Drew's long-settled, protected expectation of bodily privacy and integrity, absent exigent circumstances absent here. A reasonable officer in Defendant Violator's shoes would also have known that selecting solely the female suspect for an intrusive body search while leave her similarly situated male companion unsearched amounted to discrimination on the basis of sex.

44. The Taser prongs remained in Mr. Drew's back, giving him pain.  While awaiting his appearance before a magistrate, he requested medical assistance to remove them.  In response, one deputy came over and started tugging in the prongs.  He succeeded in doing nothing but hurting Mr. Drew.  Ms. Drew, watching the proceedings from where she remained sitting, called out repeatedly to the deputies to stop hurting her husband.

45. Eventually, a man wearing a vest labeled "Animal Control" came over, placed one hand on Mr. Drew's upper back and separately yanked both barbed prongs out of his back with

the other, causing Mr. Drew sharp pain and to bleed profusely. He was given some paper towels and told to wipe the blood from his own back.

46. In due course the Drews were brought before a magistrate, appearing on a computer monitor. Based upon false information provided by Deputy Irby, the magistrate charged Mr. Drew with public intoxication and obstruction of justice by threat or intimidation, and Ms. Drew with obstruction of justice. These charges were baseless figments of Dep. Irby's imagination.

47. Astounded to have been charged with public intoxication, Mr. Drew promptly requested a breathalyser test. The test was performed shortly thereafter and he blew a 0.00, confirming intake documentation to the effect that Mr. Drew did not appear to be intoxicated. Despite confirming, and thereafter expressly noting, Mr. Drew's sobriety, Deputy Irby took no steps to secure the dismissal of the intoxication charge.

48. The Drews were placed in separate cells in the detention center, where they remained for abut three hours.

49. On January 3, 2020, the first time the Drews were to appear in court, all the charges filed against them by Deputy Irby were dismissed on motion of the prosecutor.

50. As a result of Dep. Irby's actions complained of herein, Mr. Drew has suffered physical injury, and both Drews have suffered humiliation, embarrassment and severe emotional distress, not in the least at having been abused in front of their children. They have also incurred expenses associated with securing a criminal defense and expungements of their records. As a result of her arrest, Ms. Drew also suffered adverse professional consequences, including to her potential selection as a school principal.

51. As a result of defendant Violator's actions complained of herein, Ms. Drew suffered a severe and gratuitous assault on her person, bodily integrity and privacy, and the accompanying humiliation and embarrassment.

52. The actions of Dep. Irby and Dep. Violator here at issue were malicious, wanton, willful, and committed in the awareness that they were prohibited by settled law as well as departmental regulations.

Causes of Action

Count I

Unreasonable Arrest:  Dep. Irby/Greg Drew

53. By arresting Mr. Drew without probable cause as set forth above, Deputy Irby unreasonably seized Mr. Drew in violation of his Fourth Amendment rights.

Count II

Excessive Force: Dep. Irby/Greg Drew

54. Deputy Irby's use of his Taser as set forth above was excessive and objectively unreasonable in violation of Mr. Drew's Fourth Amendment rights.

Count III

False Arrest / False Imprisonment: Dep. Irby/Greg Drew

55. By arresting Mr. Drew without grounds or probable cause as set forth above, Deputy Irby restrained Mr. Drew's physical liberty without legal justification, amounting to false arrest or false imprisonment in violation of the common law of Virginia.

Count IV

Malicious Prosecution: Dep. Irby/Greg Drew

56. By compelling Mr. Drew to appear in court to answer the baseless criminal charges he had brought against him, Dep. Irby maliciously prosecuted Mr. Drew in violation of Virginia common law.

Count V

Unreasonable Entry: Dep. Irby/Carla Drew

57. By entering the Drew home without a warrant, without permission, for no legitimate reason, without probable cause or reasonable suspicion that unlawful activity was afoot, and without exigent circumstances, all as set forth above, Deputy Irby violated Carla Drew's Fourth Amendment right to the sanctity of her home and the right to be free from unjustified entries into her home by law enforcement officers.

Count VI

Unreasonable Seizure: Dep. Irby/Carla Drew

58. In commanding Carla Drew to lie on the floor as set forth above, Dep Irby effectuated an unreasonable seizure of her person in violation of her rights under the Fourth Amendment.

Count VII

Unreasonable Arrest:  Dep. Irby/Carla Drew

59.  By arresting Ms. Drew without probable cause as set forth above, Deputy Irby unreasonably seized her in violation of her Fourth Amendment rights.

Count VIII

False Arrest / False Imprisonment: Dep. Irby/Carla Drew

60.  By arresting Ms. Drew without grounds or probable cause as set forth above, Deputy Irby restrained her physical liberty without legal justification, amounting to false arrest or false imprisonment in violation of the common law of Virginia.

Count IX

Malicious Prosecution: Dep. Irby/Carla Drew

61.  By compelling Ms. Drew to appear in court to answer the baseless criminal charges he had brought against him, Dep. Irby maliciously prosecuted her in violation of Virginia common law.

Count X

Unreasonable Search: Defendant Violator/Carla Drew

62.  In subjecting Ms. Drew to a sexually intrusive search as set forth above, defendant Violator violated Carla Drew's Fourth Amendment right to be free from unreasonable searches of her person.

Count XI

Sexual Battery: Defendant Violator/Carla Drew

60. In subjecting Ms. Drew to a gratuitous, professionally impermissible, sexually intrusive search as set forth above, defendant Violator engaged in the sexual battery of Carla Drew, in violation of Code of Va. §18.2-67.4(A).

Count XII

Sex Discrimination: Defendant Violator/Carla Drew

60. In subjecting Ms. Drew to a gratuitous, professionally impermissible, sexually intrusive administrative search, while not undertaking to search Mr. Drew at all, as set forth above, defendant Violator discriminated against Ms. Drew on the basis of sex, in violation of the Fourteenth Amendment of the United States Constitution.

* * *

Wherefore, Greg and Carla Drew seek the following relief:

* an award of compensatory damages in amounts appropriate to the proof at trial,
* an award of punitive damages in amounts appropriate to the proof at trial,
* an award of their reasonable attorneys fees and costs; and
* such other relief as is just.

The Drews request trial by jury.

    Respectfully submitted,

    GREGORY AND CARLA DREW,

    By counsel

Dated:   July 2, 2020

Counsel for Plaintiffs:

//s// Victor M. Glasberg
Victor M. Glasberg, #16184
Bernadette E. Valdellon, *pro hac vice* pending
Victor M. Glasberg & Associates
121 S. Columbus Street
Alexandria, VA  22314
703.684.1100 / Fax: 703.684.1104
vmg@robinhoodesq.com
bev@robinhoodesq.com

DrewGregCarla\Pleadings\Complaint(2020-0701)